# IN THE COURT OF APPEALS OF IOWA

No. 4-016 / 13-0035
Filed April 30, 2014

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**BRADLEY WILLIAM ARTERBURN,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Mahaska County, Lucy J. Gamon, Judge.

A defendant appeals his conviction for first-degree murder. **AFFIRMED.**

Alfredo Parrish and Andrew Dunn of Parrish, Kruidenier, Dunn, Boles, Gribble, Gentry & Fisher, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Mary Triick and Denise Timmins, Assistant Attorneys General, and Rose Anne Mefford, County Attorney, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**TABOR, J.**

Bradley Arterburn killed his mother's boyfriend, Robert "Hank" Horovitz, by striking him with a battle axe and slitting his throat with a knife. At trial, Arterburn raised defenses of insanity and diminished responsibility, testifying that before and during the attack he experienced flashbacks to being sexual abused by his stepfather as a child. A jury convicted Arterburn of first-degree murder.

On appeal, Arterburn advances several claims of ineffective assistance of counsel; challenges the rejection of his insanity defense and the sufficiency of the State's evidence of malice aforethought, premeditation, deliberation, and specific intent to kill; and argues the district court improperly allowed into evidence a photograph of his abuser. We affirm Arterburn's first-degree murder conviction, finding substantial evidence to uphold the jury's verdict. We conclude the undated photograph of Arterburn's stepfather was not relevant, but its admission was harmless. Finally, we preserve the claims of ineffective assistance of counsel concerning change of venue and an allegedly biased juror. We deny the ineffective-assistance claims alleging prosecutorial misconduct.

## I.     Background Facts And Proceedings

From age eight to eleven, Arterburn suffered horrendous sexual abuse at the hands of his stepfather, Dave Myers. Myers fondled Arterburn almost daily, engaged in sex acts with the boy, and ejaculated on his face. Myers molested Arterburn's friends and even forced Arterburn to watch while Myers had a sexual encounter with the boy's dog. Arterburn revealed the abuse to his mother in 1997. Myers was convicted and sent to prison. But Arterburn often had

nightmares Myers would return and hurt him again.  At age eighteen, Arterburn began collecting swords, knives, and other blades, as well as guns, out of concern for his safety.  Arterburn's mother, Linda, promised her son if someone she dated ever reminded him of Myers, she would end the relationship.

Linda took her son to specialized therapy for victims of sexual assault as soon as the abuse came to light.  Arterburn continued seeing various counselors over the years.  He has been diagnosed with major depressive disorder, generalized anxiety disorder, posttraumatic stress disorder, social anxiety disorder, adjustment disorder, and attention deficit hyperactivity disorder.  In June 2010, Arterburn sought treatment from Diane Simons, a physician's assistant, who prescribed Seroquel, Topamax, Zolpidem, Prozac, Gabitril, Trazodone, and Ambien for him.  She considered Arterburn, who was then twenty-five years old, to be stable on his medication.

Arterburn dropped out of high school but earned his GED and attended community college classes.  He did not hold a job, except for a short stint at Dairy Queen when he was sixteen.  He qualified for Social Security assistance and paid rent to stay in his mother's basement.  Arterburn had a close relationship with his sister, Brianna, and sometimes babysat for her daughter.

In June 2011, his mother, Linda, met Hank Horovitz online.  Their relationship moved quickly.  On the first weekend in June, Horovitz stayed at the family home in Oskaloosa.  Horovitz spent time with Linda in her bedroom and those dalliances bothered Arterburn.  Arterburn told his mother that Horovitz reminded him of Myers and asked her not to date him, at least not while

Arterburn continued to live in the home. Arterburn expressed these same sentiments to his sister. Brianna had not met Horovitz but shared her brother's concern about their mother rushing into this relationship.

Despite Arterburn's discomfort, Linda decided to let Horovitz move in. Linda recalled that on the afternoon of June 19, 2011, Horovitz told Arterburn about their plans: "Hank was really happy about the fact that we were going to move in together and later get married, and he just kind of blurted it out to Brad." This news greatly upset Arterburn. At first, Arterburn told his mother: "[T]his is a family home," and it was not her decision alone to allow Horovitz to live with them. He then asked her to wait for him to move out before letting Horovitz move in.

Later that day, Arterburn saw Horovitz sitting at the computer in the family room without his shirt on. Arterburn testified he "started seeing Dave" and could not get the visions of his abuser out of his head. Arterburn tried to calm down by going to the video store and to Subway. Arterburn returned home and went to his bedroom in the basement where he watched a movie, but he could not shake his flashbacks. Arterburn then took his German Shepherd, Buddy,[1] out for a walk, and when he returned, Arterburn heard Horovitz say: "he likes my dog and my dog likes him." Horovitz's reference to his dog further triggered Arterburn's memory of Myers's abuse: "I immediately started having flashbacks about Buddy and about me."

---

[1] Arterburn testified he used the name "Buddy" for both his childhood pet and his current German Shepherd.

Arterburn testified he believed he had to "protect" himself. He went to his basement bedroom, grabbed a battle axe from the wall, walked back upstairs, and struck Horovitz in the back with its blade. Arterburn struck him again and again, then took a knife from his pocket and slit Horovitz's throat. In total, Horovitz suffered seventeen sharp force injuries; the medical examiner determined he died from "bleed[ing] out."

During the struggle, Hank yelled for Linda to help him, but Arterburn threw her against the fireplace. When she tried to call police, Arterburn grabbed the cell phone and snapped it into two pieces. Arterburn told his mother "he doesn't deserve for you to call 911." Arterburn then turned the knife on himself. As he was stabbing himself in the chest, Arterburn told his mother it was "all her fault." Arterburn next went out on the deck to smoke. Arterburn testified he hoped his chest wounds would be fatal. He also testified he wanted the police officers reporting to the scene to shoot him. He charged at one officer, trying to achieve that result. Instead, another officer subdued him with a taser, placed him under arrest, and transported him to the hospital.

At the hospital, in the early morning hours of June 20, 2011, Iowa Division of Criminal Investigation Special Agent Adam DeCamp interviewed Arterburn. After waiving his *Miranda* rights, Arterburn admitted he "just snapped" on his mother Linda because he "couldn't take it anymore . . . [s]he put me through so much shit." He told the agent about his stepfather, Dave Myers, explaining: "She got married and I got abused, sexually abused." He described how he was "ambushed" by the news that his mother and "her boyfriend that she only knew

for two weeks" were moving into the house together. Arterburn told DeCamp the boyfriend's name was "Hank." Arterburn admitted "go[ing] after Hank" and hurting him. Arterburn did not tell the agent that he mistook Hank for Dave during the attack. Instead, Arterburn described his motive, as "just trying to make my mom suffer." He explained: "I was hoping she would have to lose both of us." When the agent told Arterburn that Hank was dead and asked who was responsible for his death, Arterburn said his mom Linda was responsible.

On June 28, 2011, the State charged Arterburn with murder in the first degree, in violation of Iowa Code section 707.1 and 707.2(1) (2011), a class "A" felony. On September 7, 2011, Arterburn filed notice under Iowa Rule of Criminal Procedure 2.11(11), claiming the defenses of insanity and diminished responsibility. The court held a hearing on May 14, 2012, regarding Arterburn's competency to stand trial. Based on a psychiatric evaluation done by Dr. Eva Christiansen, the court found Arterburn competent to stand trial.

A jury trial began on September 25, 2012. After a day of voir dire, the court impaneled a jury. On October 3, 2012, the jury returned a verdict finding Arterburn guilty of first-degree murder. On December 10, 2012, the court sentenced him to life in prison. Arterburn now appeals his conviction.

## II.     Scope and Standards of Review

Arterburn claims his trial counsel's performance was constitutionally deficient; we review those claims de novo. *See State v. Finney*, 834 N.W.2d 46, 49 (Iowa 2013). Because Arterburn's allegations of cumulative error also involve the constitutional right to a fair trial, we review the record de novo under a

totality-of-the-circumstances test for those claims as well. *See State v. Carey*, 165 N.W.2d 27, 36 (Iowa 1969); *State v. Hardy*, 492 N.W.2d 230, 236 (Iowa Ct. App. 1992); *see also Conner v. State*, 362 N.W.2d 449, 458 (Iowa 1985).

We review Arterburn's challenge to the admission of a photograph into evidence for an abuse of discretion; we will not reverse unless the evidence is prejudicial. *See State v. Hunt*, 801 N.W.2d 366, 374 (Iowa Ct. App. 2011).

Finally, we review claims of insufficient evidence, preserved by a motion for judgment of acquittal, for errors at law. *State v. Hawkins*, 620 N.W.2d 256, 258 (Iowa 2000). We view the record in the light most favorable to the State, and make all legitimate inferences and presumptions that may be reasonably deduced from the evidence. *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005). "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence, and credit other evidence." *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006) (quoting *State v. Anderson*, 517 N.W.2d 208, 211 (Iowa 1994)).

## III. Analysis

### A. Ineffective Assistance of Counsel

Arterburn alleges his trial attorney performed below professional standards in three ways: (1) by failing to move for a change of venue, (2) by failing to move to strike juror L.D. based on her preconceived notions of the case, and (3) by failing to take the proper action in response to alleged prosecutorial

misconduct.[2]  We will assess each claim separately and then will consider Arterburn's assertion regarding the cumulative effect of counsel's errors.

In assessing counsel's performance, we look to the familiar two-prong test in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Under *Strickland,* appellate courts first decide if the representation dropped below an objective standard of reasonableness.  *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014). That first prong, testing for constitutional deficiency, is linked to the practice and expectations of the legal community.  *Id.*  "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland.  Id.* at 1089.  On the other hand, strategic choices by counsel after thorough investigation of the law and facts are "virtually unchallengeable." *Id.* (quoting *Strickland*, 466 U.S. at 690–91).

The second question asked by appellate courts under *Strickland* is if there exists a reasonable probability that, but for counsel's unreasonable actions, the result of the proceeding would have been different.  *Id.* at 1088.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 1089 (quoting *Strickland*, 466 U.S. at 694).  The proper prejudice standard is a point of contention in this appeal, which we will further discuss in our analysis of Arterburn's challenge to his trial attorney's handling of jury selection.

---

[2] Arterburn also alleges counsel was ineffective in connection with the motion for judgment of acquittal and its failure to specifically address the insanity defense.  As we will discuss later in this opinion, we find counsel preserved error on both of Arterburn's appellate challenges to the sufficiency of the State's proof.

Generally, we do not resolve claims of ineffective assistance of counsel on direct appeal. *State v. Biddle*, 652 N.W.2d 191, 203 (Iowa 2002). We prefer to leave such claims for postconviction-relief proceedings. *State v. Lopez*, 633 N.W.2d 774, 784 (Iowa 2001). Those proceedings allow the parties to develop an adequate record "and the attorney charged with providing ineffective assistance may have an opportunity to respond to defendant's claims." *Biddle*, 652 N.W.2d at 203. We will decide ineffective-assistance claims on direct appeal when the record is sufficient to resolve them. *State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978).

### 1. Motion for Change of Venue

Arterburn alleges his trial counsel should have filed a motion for change of venue under Iowa Rule of Criminal Procedure 2.11(10)(b).[3] To prevail on this claim, Arterburn must prove the publicity attending the case was so pervasive and inflammatory that prejudice must be presumed or that actual prejudice occurred. *State v. Simmons*, 454 N.W.2d 866, 867 (Iowa 1990). Counsel may request a change of venue when it appears likely during jury selection that "there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from the county." *State v. Newell*, 710 N.W.2d 6, 33 (Iowa 2006).

---

[3] If the court is satisfied from a motion for a change of venue and the evidence introduced in support of the motion that such degree of prejudice exists in the county in which the trial is to be held that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from that county, the court either shall order that the action be transferred to another county in which the offensive condition does not exist, as provided in rule 2.11(10)(c), or shall order that the trial jury be impaneled in and transferred from a county in which the offensive condition does not exist, as provided in rule 2.11(10)(d).

Arterburn claims the Mahaska County jury pool included too many people who knew about his deadly attack on Horovitz or had another association with the case. By his calculations, thirty-six of the forty-six prospective jurors had some kind of connection to his case. He highlights twenty-two prospective jurors who learned of the killing through the media and seven of those who heard the weapon used was a battle axe. Four of those twenty-two were struck for cause. He further argues nine learned about the case through family or community relationships, and thirteen were acquainted with law enforcement officers, the attorneys, Linda Arterburn, or other witnesses. Arterburn points out, of the twelve jurors impaneled, seven had heard about the case before voir dire, two knew someone involved in the case, five had some exposure to persons with mental illness, one knew a crime victim, and three knew other members of the jury venire. Of the twelve impaneled jurors, only two had no disclosed connection to the case, according to Arterburn.

Not all of Arterburn's statistics support his claim counsel should have sought a change of venue. Potential jurors from Mahaska County would not differ from Iowans in other counties by virtue of knowing people with mental illness, knowing people who have been victims of crime, or knowing other members of their community called for jury duty. As for the jurors who heard about the killing before voir dire, their mere exposure to news accounts does not rise to the level of a substantial likelihood for prejudice.[4] *See State v. Walters,*

---

[4] The United States Supreme Court wrote the following about pretrial publicity more than fifty years ago:

426 N.W.2d 136, 138 (Iowa 1988). To be fair, a juror need not be completely ignorant of the issues and events involved in a trial. *State v. Hoeck,* 547 N.W.2d 852, 861 (Iowa Ct. App. 1996). The relevant question is whether a juror holds such a fixed opinion of the merits of the case that he or she cannot impartially decide if the defendant is guilty. *Id.*

Arterburn cannot show on the existing record that such a degree of prejudice existed in Mahaska County that his counsel performed below professional norms in failing to ask for a change of venue. With the possible exception of the voir dire responses by juror L.D., which we will discuss in the next section of this opinion, Arterburn does not offer proof of actual prejudice resulting from pretrial publicity that could have been avoided by a change of venue. Moreover, both parties acknowledge the instant record is insufficient to establish presumptive prejudice resulting from pretrial publicity. Proof of presumptive prejudice would require a court to review the nature, tone, accuracy, pervasiveness, and timing of the news coverage of the killing. *See State v. Means*, 547 N.W.2d 615, 622 (Iowa Ct. App. 1996). We preserve Arterburn's

---

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961).

claim that counsel should have moved for a change of venue for possible postconviction proceedings so the record may be developed.

### 2. Striking Juror L.D. for Cause

Arterburn also argues his counsel breached an essential duty by not seeking to remove juror L.D. for cause. For-cause challenges are governed by Iowa Rule of Criminal Procedure 2.18(5)(k). Under that rule, counsel may seek to remove a potential juror for cause if the juror has formed a fixed opinion of the defendant's guilt. Due process demands that if a jury is provided the jurors cannot have formed an opinion on the defendant's guilt in advance of trial. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Turner v. Louisiana*, 379 U.S. 466, 471 (1965); *see also Morgan v. Illinois*, 504 U.S. 719, 727 (1992).

During jury selection L.D. told the court she had heard about the case on local radio and television stations. She said she was "upset" by what she had seen and heard because she has a daughter who lives near where the killing took place. She said she could decide the case on the evidence presented at trial rather than what she heard in news accounts. But when defense counsel asked if she felt his client "probably did it," she replied: "I'm afraid so." Defense counsel then asked her: "If you're sitting in my client's chair, would you feel comfortable with somebody indicating what you've just indicated sitting on a jury?" L.D. candidly said: "No." She then said she could "try" to be fair and impartial. Later she said it would be "hard" for her to be impartial. The defense moved to strike L.D., explaining: "I think that there's still enough of a

preconceived notion in her mind to where I don't think she's coming into the process clean."

The prosecuting attorney followed up by asking L.D.: "If the Court instructs you that you're not supposed to consider the previous things that you heard, will you do that?" She replied: "Yes, I will do that." The prosecutor then asserted L.D. should be able to remain in the jury pool. Defense counsel asked her whether she would listen to the court's instructions and follow them. She replied: "Yes. Oh, yes." Defense counsel then asked: "Can you be fair and impartial in this case?" She replied: "Yes. I will." Hearing that, defense counsel withdrew his request to strike L.D., and she served on the jury.

Arterburn argues the facts here are similar to those in *State v. Neuendorf*, 509 N.W.2d 743 (Iowa 1993). There, a prospective juror said she would try to overcome her prejudices but added it would be difficult. *Id.* at 745. The supreme court agreed the juror was subject to a challenge for cause. *Id.* at 746. Here, L.D. indicated she would "try" to be fair and impartial but added, "I don't know" when asked if she could disregard her previous knowledge of the case. Arterburn argues L.D.'s "[a]ffirmations of impartiality are unpersuasive in the face of multiple statements to the contrary."

The State counters with *Simmons*, 454 N.W.2d at 868, where the supreme court found no abuse of discretion in the district court's denial of a challenge for cause to jurors who affirmatively indicated that though they were troubled by what they knew about the case from extrajudicial sources, they would withhold judgment and presume the defendant innocent until the evidence proved

otherwise. The court held a "mere reservation" about impartiality does not justify removal for cause. *Id.* The State contends L.D. was rehabilitated by her responses to the attorneys' final questions.

We find the answer lies somewhere in between an indelible taint and a surefire rehabilitation. We disagree that L.D.'s original views were so entrenched that she was ineligible to serve as a juror. But we also disagree that she was automatically cleansed of any preconceived bias by giving an affirmative response to the attorneys' leading questions.

The following passage from *Irvin* is on point:

> Light impressions which may fairly be supposed to yield to the testimony that may be offered; which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them; which will combat that testimony and resist its force, do constitute a sufficient objection to him.

*Irvin*, 366 U.S. 722 n.3 (quoting Chief Justice Marshal from 1 Burr's Trial 416 (1807)).

L.D. presented an enigma for defense counsel. Counsel vacillated between believing she needed to be struck for cause and believing she could be a fair and impartial juror. The question on the performance prong is whether counsel's ultimate decision to withdraw his motion to strike L.D. was, without the benefit of hindsight, reasonable under all of the circumstances as trial counsel saw them at the time of voir dire. *See Strickland*, 466 U.S. at 690. We cannot gauge the reasonableness of trial counsel's strategy on our cold, written record

of jury selection. In analyzing a *Batson*[5] challenge, the California Supreme Court offered the following observations which we find relevant to our reluctance to decide this claim on direct appeal:

> Experienced trial lawyers recognize what has been borne out by common experience over the centuries. There is more to human communication than mere linguistic content. On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact. Even an inflection in the voice can make a difference in the meaning.

*People v. Lenix*, 187 P.3d 946, 961 (Cal. 2008).

We preserve this claim of ineffective assistance for possible postconviction-relief proceedings where counsel would have an opportunity to explain his decision to leave L.D. on the jury. *See Coil,* 264 N.W.2d at 296 ("Even a lawyer is entitled to his day in court, especially when his professional reputation is impugned."). Arterburn's appellate counsel urges us to decide on direct appeal that trial counsel breached his professional duty by backing away from questions he should have asked L.D. to probe her preconceived notion of the defendant's guilt. We decline to do so when it is possible for trial counsel to rehabilitate his performance by suggesting a reasonable trial strategy for withdrawing his motion to strike L.D. *See Virgil v. Dretke*, 446 F.3d 598, 610 (5th Cir. 2006) (considering, yet rejecting defense counsel's explanation, offered in state habeas proceedings, for not challenging certain jurors).

---

[5] *Batson v. Kentucky,* 476 U.S. 79 (1986) (prohibiting challenge to potential jurors solely on the account of their race).

We also decline the State's invitation to reject this claim on direct appeal based on the lack of *Strickland* prejudice. The State argues that in addition to proving his trial attorney was constitutionally deficient in not moving to strike L.D., Arterburn must show the outcome of the trial would have been different if an unbiased juror had deliberated in L.D.'s place—a task he cannot accomplish. The State cites *Ledezma v. State*, 626 N.W.2d 134, 144-45 (Iowa 2001), for the proposition that the reasonable probability of a different "result" under *Strickland* means "the reasonable probability of a different verdict, or that the fact finder would have possessed reasonable doubt."

Arterburn insists *Strickland* prejudice is "contextual." In *Ledezma*, the context was counsel's performance regarding the development and presentation of evidence, and prejudice existed if that evidence ultimately had an impact on the outcome of the trial. In the jury selection context, Arterburn believes he satisfies the prejudice standard by showing that had counsel challenged L.D. for cause, the district court would have been legally obligated to strike her and a different, unbiased juror, would have served. Arterburn says it would be impossible for him to prove there was a reasonable probability that a jury without L.D. would have acquitted him.

Arterburn's position has been accepted by several federal circuit courts. For instance, the Fifth Circuit Court of Appeals reasoned: "*Strickland's* prejudice inquiry is process-based: Given counsel's deficient performance, do we have confidence in the process afforded the criminally accused?" *Virgil*, 446 F.3d at 612. In *Virgil*, the court was confronted with a situation where, due to counsel's

deficient performance, two people who admitted bias were allowed to sit on the jury.  *Id.*  The court concluded, given the fundamental nature of seating an impartial jury, the result of Virgil's trial was unreliable.  *Id.*  The court stated:

> "The jury box is a holy place."  Our criminal justice system is predicated on the notion that those accused of criminal offenses are innocent until proven guilty and are entitled to a jury of persons willing and able to consider fairly the evidence presented in order to reach a determination of guilt or innocence.

*Id.* at 613 (quoting *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)).

The Fifth Circuit lacked confidence in the adversarial process that resulted in Virgil's conviction: "Expressed in *Strickland* terms, the deficient performance of counsel denied Virgil an impartial jury, leaving him with one that could not constitutionally convict, perforce establishing *Strickland* prejudice with its focus upon reliability."  *Id.* at 613–14.

The Eighth Circuit also held that a defendant whose attorney fails to attempt to remove biased persons from a jury panel is prejudiced.  *Johnson v. Armontrout*, 961 F.2d 748, 755–56 (8th Cir. 1992), *called into doubt by United States v. Johnson*, 688 F.3d 494 (8th Cir. 2012).  In *Johnson v. Armontrout*, the court rejected the government's argument that the seating of biased jurors did not affect the outcome of the trial, and therefore, there was no showing of prejudice under *Strickland*: "This is an assumption we cannot make.  Trying a defendant before a biased jury is akin to providing him no trial at all.  It constitutes a fundamental defect in the trial mechanism itself."  *Id.* at 755; *see also Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (holding when a

biased juror is impaneled, prejudice under *Strickland* is presumed, and a new trial is required); *accord Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004).

If trial counsel's performance was deficient, Arterburn can show he was prejudiced by the impaneling of a biased juror.[6] That showing alone would undermine our confidence in the conviction. We do not believe Arterburn must further establish it was reasonably probable a jury featuring an impartial juror in L.D.'s place would have acquitted him. The assessment of prejudice articulated in *Strickland* proceeds on the assumption that the decision makers are impartial. *Strickland,* 466 U.S. at 695. When a biased juror is impaneled, the fundamental fairness of the proceedings is called into question, and a new trial is required. *Hughes*, 258 F.3d at 463 (internal citations omitted). This prejudice analysis is consistent with *Ledezma*, where our supreme court recognized that "unique situations" may call for a different formulation of the "different result" standard from *Strickland. Ledezma*, 626 N.W.2d at 145 (citing *Wanatee v. Ault,* 101 F. Supp. 2d 1189, 1197 (N.D. Iowa 2000)).

On direct appeal, we cannot rule for Arterburn on the performance of counsel prong, nor can we rule against him on the prejudice prong. Therefore, we preserve his ineffective-assistance claims concerning jury selection for a potential postconviction-relief action.

---

[6] In the context of preserved challenges for cause, the court does not "presume prejudice"; the defendant must show (1) an error in the court's ruling on challenge for cause and (2) either (a) the challenged juror served on the jury or (b) the remaining jury was biased as a result of the defendant's use of all the peremptory challenges. *See State v. Tillman*, 514 N.W.2d 105, 107 (Iowa 1994) (citing *Neuendorf*, 509 N.W.2d at 747). But if the jury that ultimately sat was in some way biased against the defendant, we would not indulge a further argument that its verdict could be harmless if an impartial jury would have reached the same result.

### 3.    Alleged Prosecutorial Misconduct

Arterburn next alleges two instances of prosecutorial misconduct mishandled by trial counsel. The first allegation involves the prosecutor's redirect examination of Arterburn's sister, Brianna, and the second allegation implicates the State's closing argument.

To show he was denied due process by counsel's failure to object to conduct by the prosecutor, Arterburn must first show proof of misconduct. *See State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). Arterburn does not need to offer evidence of the prosecutor's bad faith, as a trial can be unfair even when the prosecutor has acted in good faith. *See id.* The second requirement is that prejudice resulting from the misconduct denied Arterburn a fair trial. *See id.* Courts examine (1) the severity and pervasiveness of the misconduct, (2) the significance of the misconduct to the central issues in the case, (3) the strength of the State's evidence, (4) the use of cautionary instructions or other curative measures, and (5) the extent to which the defense invited the misconduct. *Id.*

We turn first to the claim concerning the examination of Arterburn's sister. While discussing a defense motion in limine before trial, the prosecutor agreed not to broach the subject of Arterburn's past acts of physical violence toward his sister "unless the defense . . . starts putting in character evidence that he was a gentle person . . . a non-violent person." During cross-examination, defense counsel asked Brianna if Arterburn was a "kind" and "gentle" person when he was on his medication. She answered yes.

On redirect, the prosecutor asked Brianna: "Your brother has had some issues in the past. Correct?" Brianna responded: "Yes." The prosecutor then asked: "And there were times in his past where he wasn't always gentle and kind, isn't that correct?" Defense counsel objected, claiming a violation of the motion in limine. The court "sustained preliminarily" the objection and advised the parties the matter could be taken up outside the presence of the jury. Later, outside the presence of the jury, the court ruled the State was not allowed to ask about Arterburn's conduct predating his current medication regimen.

On appeal, Arterburn argues counsel was ineffective by failing to "move for a mistrial, request the question be stricken, or ask for a cautionary instruction."

Arguably, defense counsel opened the door to the discussion of Arterburn's prior acts by asking about his conduct while on medication. *See State v. Mitchell*, 670 N.W.2d 416, 420 (Iowa 2003). But even if the State's question to Briana violated the motion in limine, the breach was not severe or pervasive. Defense counsel lodged a successful objection to the line of inquiry. Arterburn's sister never answered the question. The court instructed the jury that counsel's questions are not evidence. Counsel was not ineffective for declining to draw more attention to the disputed question or by failing to seek a mistrial based on an isolated inquiry. *See State v. Krogman*, 804 N.W.2d 518, 526 (Iowa 2011) (holding isolated incident of misconduct does not usually result in prejudice).

Arterburn next argues the prosecutor acted improperly during closing arguments by asking the jury to return a guilty verdict to protect the community. He contends trial counsel should have lodged an objection. In arguing that Arterburn had not proven his defense of insanity, the prosecutor told the jury, "There's no question in this case the defendant has mental health issues. Okay? But if every person in this country with mental health issues couldn't be held criminally responsible for their actions, imagine what that would be like."

On appeal, Arterburn argues the prosecutor's remark suggested to the jury that if he were found not guilty by reason of insanity "the community is in danger and you must protect the community." Normally, a prosecutor's comments suggesting the need to protect the "community" from the actions of the defendant are improper when used to inflame the jury. *See State v. Johnson*, 534 N.W.2d 118, 128 (Iowa Ct. App. 1995) (stating prosecutor urged jury to convict to "protect community values").

But when viewed in context, the prosecutor's comment was not sounding an alarm about the potential danger of a not-guilty-by-reason-of-insanity verdict. The prosecutor did not mention community protection. The prosecutor was simply drawing a distinction between people with mental illness who are responsible for their criminal acts and the standard of proof required for an insanity defense**.** *See generally Rucker v. State*, 728 S.E.2d 205, 209 (Ga. 2012). The disputed comment was not prosecutorial misconduct, and therefore, counsel had no duty to object. *See State v. Atwood*, 342 N.W.2d 474, 477 (Iowa

1984) (explaining counsel was not ineffective for failing to make "questionable objection").

### 4.     Counsel's Cumulative Errors

Arterburn argues counsel's errors, considered together, resulted in prejudice.  When there are multiple claims of ineffective assistance of counsel, the cumulative prejudice from those individual claims should be properly assessed under the prejudice prong of *Strickland*.  *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012).  In this case we preserve two of Arterburn's claims of ineffective assistance for a more fully developed record and reject two others.  In this situation, any prejudice analysis must wait for postconviction proceedings.

### B.     Photographic Evidence

During the testimony of Linda Arterburn, the State introduced a photograph of the victim, Hank Horovitz, in life, as well as photographs of her former husband Dave Myers and her former boyfriend Jim Head.  Defense counsel objected to the photograph of Myers, arguing there was "no frame of reference about timing of when that picture was taken.  No frame of reference to why it would be relevant if it's any other time than close to the time of the abuse."  The court overruled the objection.  On cross-examination, Linda admitted she did not know when the photograph was taken.

On appeal, Arterburn contends the photograph of Myers was "wholly irrelevant under Iowa Rule of Evidence 5.402" because the State offered no proof it was taken at or near the time Myers abused him.  Because it could have been taken at any time during Myers's adult life, Arterburn argues it had "enormous"

potential to mislead the jury. He asserts: "Pictures are powerful, and this misrepresentation of Myers's visage was profoundly effective for the prosecution—it went to the very heart of the insanity claim and, as hard, visual evidence that Horovitz simply didn't look like Myers, completely negated the defense's theory."

An exhibit is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. "All relevant evidence is admissible" unless otherwise excluded. Iowa R. Evid. 5.402.

The State argues Arterburn's defense made the similarities in the appearances of Myers and Horovitz a fact of consequence at trial. On appeal, the State urges: "The photograph of Mr. Myers has at least some tendency to assist the jury in evaluating the physical similarities between the two men."

We agree with Arterburn's critique of the exhibit. To be admissible into evidence, a photograph must be "relevant to the controversy, which normally requires that the picture be identified in time and place." *State v. Holderness*, 293 N.W.2d 226, 230 (Iowa 1980). The district court admitted the photograph of Myers without requiring proper foundation. The State did not establish the photograph accurately portrayed Myers at the time he was abusing Arterburn. The district court abused its discretion when it allowed the photograph into evidence.

But that does not end our inquiry. Admission of the photograph is subject to harmless error analysis. The question is does it sufficiently appear that

Arterburn's rights have been injuriously affected by the error or that he has suffered a miscarriage of justice? *See State v. Paredes*, 775 N.W.2d 554, 571 (Iowa 2009). The State carries the burden of proving the error does not require reversal.

The trial record as a whole shows admission of Myers's photograph was harmless. The defense does not point to any efforts by the prosecution during trial to contrast the photographs of the victim and Arterburn's abuser. Moreover, the primary issue at trial was not whether Dave actually looked like Hank. It was instead, whether Arterburn was experiencing a mental disorder at the time of the killing that absolved him of criminal responsibility. While the photographs may have shed some light on the physical characteristics of the two men, they did not go to the main issues of insanity or diminished responsibility. We decline to reverse on this ground.

### C. Sufficiency of the Evidence

Arterburn contends the court should have determined as a matter of law he was not guilty by reason of insanity, or at worst, convicted him of murder in the second degree because his diminished responsibility prevented him from forming the specific intent to kill Horovitz.

### 1. Preservation of Error on Insanity Defense

Before reaching the merits of Arterburn's contentions, we address the State's argument that Arterburn failed to preserve error on his challenge to the rejection of his insanity defense.

Defense counsel moved for judgment of acquittal following the State's case-in-chief:

> [A]t this time we move for judgment of acquittal on the grounds that the State has not generated a jury question regarding whether or not the defendant acted with malice aforethought, or further, whether the defendant act[ed] willfully, deliberately, premeditatedly, and with a specific intent to kill Robert Horovitz.

The State resisted, and the court overruled the motion. Defense counsel renewed the motion at the close of all evidence, and the court again overruled it.

On appeal, the State argues at no point during the trial did Arterburn claim he had established his insanity as a matter of law. While that is true, defense counsel did argue the State failed to generate a jury question on the element of malice aforethought. Evidence of insanity may negate the element of malice aforethought under Iowa law. *Anfinson v. State*, 758 N.W.2d 496, 503 (Iowa 2008). Accordingly, we find Arterburn preserved error on his claim he should not have been convicted because he was insane at the time of the killing.[7]

### 2.      Proof of First-Degree Murder

To support a conviction for murder in the first degree, the State had the burden to prove, beyond a reasonable doubt, the following elements:

> 1.   Arterburn stabbed and or cut Horovitz with an axe or knife.
> 2.  Horovitz died as a result of that stabbing or cutting.

---

[7] We recognize that because insanity is an affirmative defense under Iowa Code section 701.4 and Iowa Rule of Criminal Procedure 2.11(11), which a defendant must prove by a preponderance of the evidence, a motion for judgment of acquittal asking the court to find the defense has met its burden may be more realistically advanced after the close of all evidence than following the State's case-in-chief. *See generally* Iowa R. Crim. P. 2.19(8)(a) ("If a defendant's motion for judgment of acquittal at the close of the evidence offered by the prosecuting attorney is not granted, the defendant may offer evidence without having waived the right to rely on such motion.").

3. Arterburn acted with malice aforethought.

4. Arterburn acted willfully, deliberately, premeditatedly and with specific intent to kill.

Arterburn does not dispute the first two elements. He instead argues his insanity neutralized any proof of malice aforethought or, alternatively, he was unable to form the specific intent to kill because of his diminished responsibility.

The insanity defense provides:

A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act.

Iowa Code § 701.4. The law presumes Arterburn is sane until he proves otherwise by a preponderance of the evidence. *See id.*

Unlike the insanity defense, proving diminished responsibility does not fall to Arterburn. *State v. Stewart*, 445 N.W.2d 418, 422 (Iowa Ct. App. 1989). Instead, the jury considers evidence of diminished responsibility to decide if the State met its burden of proving specific intent. *Id.*

We first consider whether Arterburn acted with malice aforethought. Malice aforethought is "a fixed purpose or design to do some physical harm to another that exists before the act is committed." *Newell*, 710 N.W.2d at 21. Iowa law allows the jury to presume a person who uses a deadly weapon acted with malice aforethought. *State v. Reeves*, 670 N.W.2d 199, 207 (Iowa 2003). That presumption may be rebutted by evidence of mental incapacity. *Id.* Moreover, proof of motive is not a necessary element of murder, but the absence of motive

may be considered on the question the accused acted with malice aforethought. *Id.* Finally, the malice aforethought necessary to convert a homicide into murder need not be directed at the person actually killed. *State v. Alford*, 151 N.W.2d 573, 574 (Iowa 1967), *overruled on other grounds by State v. Bester*, 167 N.W.2d 705 (Iowa 1969).

On appeal, Arterburn denies any motive to kill Horovitz. The record does not support his denial. In his conversation with Agent DeCamp, Arterburn revealed the killing was motivated by his resentment toward his mother. Arterburn wanted her to suffer for all the grief she had caused him. He told the agent he was upset by the news of his mother's engagement to Horovitz. Even in his trial testimony, Arterburn said he grabbed the axe from his bedroom wall because "I needed to protect myself because mom wasn't protecting me like she said she was." Undisputed evidence showed Arterburn first swung the axe at Horovitz from behind and then struck him several more times, before slitting his throat with a second deadly weapon. The State offered sufficient evidence to generate a jury question regarding Arterburn's fixed purpose to do physical harm to the victim.

Arterburn claims his proof of insanity was sufficient to overcome the State's evidence of malice aforethought. The jurors heard from several experts. Dr. Eva Christianson testified Arterburn was in a dissociative state when he killed Horovitz. Dr. Craig Rypma also believed Arterburn's mental condition left him unable to appreciate his actions or understand that the killing was wrong. Dr. James Dennert disagreed; he testified Arterburn did not suffer from a psychiatric

illness that prevented him from knowing and understanding the nature and consequences of his actions or that prevented him from knowing the difference between right and wrong. Critical to Dr. Dennert's view was Arterburn's interview with Agent DeCamp soon after the attack when Arterburn explained what actions he had taken and why. This battle of the experts supported the district court's decision to submit the question of Arterburn's sanity to the jury. No trier of fact— be it a judge or a jury—is obligated to accept expert opinion evidence as conclusive. *See State v. Venzke*, 576 N.W.2d 382, 384 (Iowa Ct. App. 1997).

We next turn to the question whether Arterburn's actions were willful, deliberate, premeditated, and with the specific intent to kill. Arterburn had an opportunity to deliberate when he went to his bedroom to retrieve the battle axe. His specific intent to kill can also be inferred from the number and nature of the wounds inflicted on Horovitz. *See State v. Poyner*, 306 N.W.2d 716, 718 (Iowa 1981).

His claim of diminished responsibility, relating to his "intense flashback" of being abused by Myers, did not as a matter of law render him unable to form the specific intent to kill. Even if Arterburn sincerely mistook Horovitz for Myers, Iowa law recognizes a transfer of the intent to kill from the intended victim to the actual victim. *See State v. Huston*, 174 N.W. 641, 642 (Iowa 1919) ("The malice and intent which started the bullet is deemed in law to have followed it wherever it went."). The district court did not err in overruling Arterburn's motion for judgment of acquittal. We will not disturb the jury's verdict.

D. **Cumulative Error**

Finally, Arterburn argues the errors alleged in this appeal collectively deprived him of a fair trial. On appeal, we may grant relief if a combination of errors, resulting in unfair prejudice, warrant a new trial. *See Hardy*, 492 N.W.2d at 236. Where the defendant's individual claims do not merit relief, we reject a claim of cumulative error. *State v. Artzer*, 609 N.W.2d 526, 532 (Iowa 2000). Here, the only error we found was the admission of the undated photograph of Arterburn's stepfather, and that error was harmless in the overall scheme of the case. Arterburn cannot show cumulative prejudice warrants a new trial.

**AFFIRMED.**