**STATE of Iowa, Appellee,**

v.

**Jason Jon MEANS, Appellant.**

No. 94–1038.

Court of Appeals of Iowa.

Feb. 28, 1996.

Kent A. Simmons, Davenport, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, William E. Davis, County Attorney, and Michael Walton and Realff Ottesen, Assistant County Attorneys, for appellee.

Heard by HAYDEN, P.J., and HABHAB and CADY, JJ.

CADY, Justice.

Jason Means appeals his convictions and sentences for second-degree murder, first-degree robbery, first-degree kidnapping, criminal gang participation, conspiracy to commit robbery and possession of an offensive weapon. Upon our review, we affirm.

Michelle Jensen, a seventeen-year old high school student, lost her life in the early morning hours of August 29, 1993 as a result of a single shotgun blast to her head. Later that morning, police picked up Jason Means, along with Tony Hoeck, Justin Voelkers, Shawn Shewmake, Christopher Felgenhauer, and Joe Hager, for questioning about Jensen's death. Means informed Brown he was seventeen-years old, his parents were unavailable, and his uncle, Bradley Cook, was responsible for him. Brown contacted Cook by phone, informed him Means was being questioned as part of a homicide investigation since Means was one of the last persons known to have been with Jensen before her death. Cook then agreed to come down to the station.

Upon arriving at the station, Cook met with Lieutenant Donald Scheffer. They conversed about Means' questioning in connection with a homicide investigation and what generally was about to take place with the interview. Cook then proceeded to the room where Brown was interviewing Means.

Brown discussed the "juvenile waiver and parental consent" form with Cook and Means, which included *Miranda* warnings and a waiver of the right to counsel. Both Means and Cook signed the form but never spoke with each other outside Brown's presence. Cook was never explicitly told he had a right to confer with Means. He then left the room while Means was being interviewed, but not at the request or insistence of Brown. At some point during questioning, Means had made several inculpatory statements implicating his involvement in Jensen's death. Brown never consulted Cook again after Means began to implicate himself in the crimes.

The State charged all six men with first-degree robbery, first-degree kidnaping, criminal gang participation, and conspiracy to commit robbery. Means, Voelkers, Hoeck, Shewmake, and Felgenhauer were also charged with first-degree murder. The State further charged Means, Voelkers, and Hoeck with possession of an offensive weapon, specifically a short-barreled shotgun. Hager, Shewmake, and Felgenhauer pleaded guilty to lesser charges and agreed to testify as prosecution witnesses.

Means filed a pretrial motion to suppress his interview statements contending they were obtained in violation of Iowa Code section 232.11 (1993) and were involuntary. The district court denied Means' motion to suppress.

Means and his remaining codefendants sought a change of venue due to extensive pretrial media coverage. They sought to introduce evidence of surveys conducted by a research corporation. The district court judge asked the State how it would "inquire into the foundation." The State stated it believed the foundation had not been completed but lodged an objection to the survey based on improper foundation which the district court sustained. Numerous videotapes, transcripts, and newspaper articles were introduced into evidence. Counsel for codefendant Voelkers alerted the district court the research corporation was attempting to find a witness to come to court to lay foundation for the survey. The district court would only allow the offer of proof by Means' counsel and denied the motion for a change of venue. After a local newspaper ran an article detailing Means' codefendant's criminal history, counsel for Means renewed the motion for a change of venue which the district court denied.

At trial, evidence presented linked Means and his codefendants to the Conservative Vice Lords gang, indicated the men intended to rob a convenience store but needed Jensen's vehicle, and implied plans were made to get her car at a party held at Hoeck's residence on August 28, 1993 to use in a robbery. Witnesses testified Jensen became quite intoxicated at the party, yet resisted when Means and the others attempted to take her car keys. Testimony indicated Hoeck told Means to get a sawed-off shotgun which he called "Bud," later told Means and Voelkers to "take care of business" while handing the gun to the two men, and Means and Voelkers left with Jensen in her car stating they were "going to take her home." Shewmake, however, testified Hoeck privately told him they were going to kill Jensen. Shirley VanSant testified she heard a male voice outside her rural home, a girl sobbing, a sound similar to a shot, and a car being driven away in the early morning hours of August 29, 1993. She also stated she observed the vehicle as it drove away and it resembled Jensen's car. Hager testified Means and Voelkers returned to Hoeck's residence and informed the group Voelkers had shot Jensen. The robbery plan did not go through, according to Hager, because the store was "too busy."

The State also introduced Means and Voelkers' videotaped police interviews. The district court admitted the interviews over Means' objections and overruled his objection to the use of transcripts prepared from the videotapes.

The jury found Means guilty of second-degree murder, first-degree robbery, first-degree kidnapping, criminal gang participation, conspiracy to commit robbery, and possession of an offensive weapon. The district court sentenced him to life imprisonment for the kidnapping charge and consecutive sentences on the other convictions.

Means appeals contending the district court improperly denied his motion to suppress his statements to deputy Brown as they were obtained in violation of Iowa Code section 232.11 (1993) and were involuntary. He also argues the trial court erred in denying his motion for a change of venue and in refusing to allow a continuance to lay foundation for the surveys. Finally, he claims the district court erred in admitting Voelkers' videotaped statements without proper redaction and in allowing the jury to view transcripts of the videotaped statements which were not sufficiently authenticated.

## I. Statements given to Detective Brown
### A. Section 232.11

■ Our scope of review is for the correction of errors of law. Iowa R.App.P. 4. We view the facts in the light most favorable to the State to determine whether the prosecution met its burden to show good faith compliance with Iowa Code section 232.11 by a preponderance of the evidence. *State v. Walker*, 352 N.W.2d 239, 242 (Iowa 1984).

■ Statements obtained from juveniles arrested on suspicion of crime without valid waiver of counsel are per se inadmissible. *State v. Nelson*, 435 N.W.2d 344, 347 (Iowa 1989). A child's right to counsel during questioning by police officials, however, can be waived. If the child is under sixteen years of age, the waiver requires the written consent of the child's parents, guardian, or legal custodian. Iowa Code § 232.11(2). In contrast, if the child is at least sixteen years of age, a waiver is valid without parental consent as long as police make a good faith effort to notify the parent, guardian or custodian the child has been taken into custody, of the alleged delinquent act, the location of the child, and the right of the parent, guardian, or custodian to visit and confer with the child. *Id.*

■ The statute does not grant an absolute right of parents of children at least sixteen years of age to receive this information. Rather, it requires police to make a

good faith effort to contact parents before obtaining a waiver from their sixteen or seventeen-year old child. The good faith relates not only to the efforts to initiate contact with the parent or caretaker, but extends to the content of the contact as well. *Walker*, 352 N.W.2d at 242. A four part message is required to be conveyed if contact is made. *Id.* The purpose of this message is to impress upon the parent, guardian, or custodian the importance of going to the side of the child to give parental advice to him or her on whether they should waive their right to counsel.

■ We find Brown made a good faith effort to notify a parent or guardian to enable Means to obtain some parental advice before signing his waiver. After discovering Means' parents were unavailable, he contacted Cook, informed him Means was at the stationhouse being questioned by police in connection with a homicide investigation, and again sought information about contacting Means' mother. When Cook came to the station, Brown never specifically informed Cook he could visit and confer with Means. However, he discussed the waiver form with Cook while Means was in the same room, never prevented either from talking to each other, and was never asked to allow them to confer outside his presence.[1] Cook and Means also talked while in the presence of Brown.

Cook read and signed the form consenting to Means' decision to waive his right to counsel. He was never given any indication he could not see, speak with, or counsel Means, nor forced to separate from Means during questioning. *See In re D.J.K.*, 397 N.W.2d 707, 711 (Iowa 1986) (statute designed to guard against separating juvenile from person whom he or she would rely upon for advice).

■ We recognize when a police interrogation of a juvenile shifts from a purely investigatory interview to a custodial interrogation, the 232.11(2) requirement police make a good faith effort to notify parents is retrig-

---

1. We also note both Brown and Lieutenant Scheffer discussed the interview with Cook and that it involved a homicide investigation. Brown told Cook he was there as a substitute for Means' mother and read Means his *Miranda* rights in front of Cook.

gered. *In re D.J.K.*, 397 N.W.2d at 710 (Iowa 1986). Here, however, Cook had already signed the waiver form and had ample opportunity to counsel Means concerning the waiver of his right to counsel prior to the custodial interrogation. He was present with Means while his *Miranda* rights were being read and when Means decided to sign the waiver. Cook's presence at the police station evidenced his recognition of the importance for Means to have a parental figure available. Clearly, the police notification to Cook satisfied the purpose of the statute, namely to encourage parents to go to the station to provide counsel to children before the child waives his or her right to counsel.

We also note Cook's actions met the requirements set forth for juveniles *under* the age of sixteen. Requiring officers to renotify a parent or guardian of a child at least sixteen years old of the four messages involved in section 232.11(2) when the interview becomes custodial after a parent or guardian had already been contacted by the officers, had come down to the police station, met with the child and the interviewing officer, had been present while the *Miranda* rights were read, and signed the juvenile's waiver of counsel, would afford greater protection to juveniles over the age of sixteen than those afforded juveniles under the age of sixteen. *See generally* Iowa Code § 232.11; *In re J.A.N.*, 346 N.W.2d 495 (Iowa 1984) (custodial interrogation of child under the age of sixteen inadmissible absent parental consent).[2]

Under this situation, we cannot say the State has not proven substantial compliance with the notification procedures involved in section 232.11(2). The district court did not err in denying Means' motion to suppress statement.

### B. Involuntary Statements

■ When a defendant is alleging error involving a constitutional right, such as here, we make an independent evaluation of the totality of the relevant circumstances to determine if such an error was made. *Rinehart v. State*, 234 N.W.2d 649, 658 (Iowa 1975); *State v. Jeffries*, 417 N.W.2d 237, 239 (Iowa App.1987).

■ The State again bears the burden of showing the statements made by Means were voluntary and his will was not overborne by officers. *State v. Rhomberg*, 516 N.W.2d 803, 806 (Iowa 1994). We look to several factors to ascertain the voluntariness of a statement, including: knowledge of *Miranda* rights, age, experience, level of education, intelligence, the length of time questioned, physical punishment, physical and emotional condition, deceit or improper promises, mental weaknesses, and the ability to understand constitutional rights and consequences of waiving these rights. *State v. Reid*, 394 N.W.2d 399, 402 (Iowa 1986).

■ We disagree the statements made to Brown were a product of an overborne will and an impermissible coercive environment. Means was informed of, expressed understanding of, and waived his constitutional rights, including right to counsel and *Miranda* rights. The questioning took approximately four hours to complete, occurred during normal business hours, and displayed no undue coercion on the part of Brown. While Brown encouraged Means to "get this stuff off [his] chest," to "be straight with [Brown]," and to "tell the truth," these actions do not render the statements involuntary. *See State v. Foell*, 512 N.W.2d 809, 812–13 (Iowa App.1993) (officer placing hand on shoulder of defendant and asking him to tell the truth deemed not to be coercive). Brown offered no deceitful or improper promises, physically or mentally coerced, or took advantage of mental weaknesses of Means. Means answered the questions asked without hesitation and did not evidence emotional or physical strain.

---

2. We note in *Nelson*, a seventeen-year old defendant with a written waiver of consent which had been also signed by a parent was not also entitled to the notice provisions of Iowa Code section 232.11(2) for juveniles at least sixteen years of age. *Nelson*, 435 N.W.2d at 348. Construing section 232.11(2) to require both mechanical compliance with the four messages when parental consent is obtained would afford more protection to older juveniles and less protection to younger, more vulnerable juveniles. *Id.* Such an incongruous result was not intended by the legislature. *Id.*

We find Means' statements to Brown were voluntary. The district court committed no error in denying Means' motion to suppress.

## II. Change of Venue

### A. Denial of a Change of Venue

■ Our unique scope of review for a district court's denial of a motion for a change of venue due to trial publicity requires us to examine the record de novo to determine whether the district court's decision demonstrates an abuse of discretion. *State v. Siemer,* 454 N.W.2d 857, 860 (Iowa 1990); *State v. Love,* 302 N.W.2d 115, 122 (Iowa 1981).

■ Pretrial publicity warrants a change of venue when "such a degree of prejudice exists in the county in which the trial is to be had that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from that county." Iowa R.Crim.P. 10(10)(b). Prejudice can be shown by publicity attending the trial which is so pervasive and inflammatory that prejudice must be presumed or by actual prejudice on the part of the jury. *State v. Simmons,* 454 N.W.2d 866, 867 (Iowa 1990).

■ A juror need not be completely ignorant of the issues and events involved in a trial. *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 594–95 (1975); *State v. Gavin,* 360 N.W.2d 817, 819 (Iowa 1985). Mere exposure to news accounts does not amount to a substantial likelihood for prejudice. *State v. Walters,* 426 N.W.2d 136, 138 (Iowa 1988). News reports containing information concerning prior convictions of defendants, by themselves, do not create presumptive prejudice. *Simmons,* 454 N.W.2d at 868.

■ In order to determine whether news articles and broadcasts have prejudiced a community for venue purposes, we consider whether the accounts: indicated the defendant is guilty; were factual and informative; were inflammatory in tone; contained editorial denunciations of the defendant; contained emotional stories regarding the defen-

dant or the victim; and were inaccurate, misleading or unfair. We also look to see whether enough time had passed between the accounts and the trial date to dissipate any prejudicial effect of adverse publicity; whether panel members who professed knowledge of the case stated they could render an impartial verdict on the basis of the evidence presented at trial; and whether the trial judge sustained strikes for cause against jurors who stated they could not render an impartial verdict due to their prior knowledge. *Walters,* 426 N.W.2d at 139.

■ Here, the coverage was factual, informative, accurate and not inflammatory or misleading. Media sources did cover the funeral of Jensen, evoking emotional appeal to the victim. The funeral story, as well as a majority of the coverage, occurred several weeks prior to voir dire. However, the Quad City Times ran an article summarizing the events the day before voir dire and ran a second article after the first day of jury selection.[3]

The voir dire in the case revealed a great deal of exposure to the news coverage surrounding the trial. However, no one impaneled on Means' jury had read the second article in the Quad City Times or had heard of the sexual abuse allegations. The impanelled jury members which had been exposed stated they would be impartial, could lay aside prejudgments, and could decide the case on the evidence presented to them at trial.

We find the jury selected in this case to be fair and impartial. *See State v. Simmons,* 454 N.W.2d at 868 (intensive voir dire effective in routing out any juror prejudice). Trial court did not abuse its discretion in denying Means' motion for a change of venue due to pretrial publicity.

### B. Refusal to Grant a Continuance

■ We review a district court's denial of a motion for a continuance for an abuse of discretion. *State v. Grimme,* 338 N.W.2d 142, 144 (Iowa 1983). Error, however, must be preserved in order for appellate courts to

---

**3.** Both articles alluded to sexual abuse charges against Means and his codefendants which the State had dismissed prior to trial. The second article also listed the codefendants Hoeck and Voelkers' criminal records.

adequately evaluate the district court's potential abuses. *See State v. Smith*, 228 N.W.2d 111, 112 (Iowa 1975) (counsel bears burden of making a proper record at trial court level to preserve error on appeal).

■ Neither Means' counsel, nor any of his codefendants' counsels, made requests for a continuance in order for a foundation to be laid for the introduction of the surveys. Counsel for codefendant Voelkers only alerted the court the research company was attempting to get a witness to lay foundation for the survey. He failed, however, to request the court to allow additional time or to state his reasons. The district court had no opportunity to rule on the motion for a continuance at trial since it never faced the issue. We find error was not preserved on this issue. *See Conner v. State*, 362 N.W.2d 449, 457 (Iowa 1985) (issues not presented in the trial court may not be raised for the first time on appeal).

■ We also note the trial judge has very broad discretion to allow or disallow a continuance. *State v. Grimme*, 338 N.W.2d at 144 (Iowa 1983). *See also State v. Teeters*, 487 N.W.2d 346, 348 (Iowa 1992) (denial of continuance to secure testimony of witness proper where no indication of the amount of time it would take to secure testimony); *State v. Simmons*, 454 N.W.2d at 868 (Iowa 1990) (request for continuance for press coverage to subside properly denied where no need for change of venue). We find no abuse of discretion in denying counsel additional time to seek a foundational witness for the survey when the district court judge was given no indication as to the amount of time it would take to secure the witness, the actual existence of the witness, and the ability of the witness to lay foundation for the survey.

### III. Transcripts of Videotaped Statements

■ Claims for admissibility of evidence are reviewed for abuses of discretion. *State v. Roth*, 403 N.W.2d 762, 765 (Iowa 1987). In order for exhibits, such as transcripts or affidavits, to be admitted into evidence at trial, they must be authenticated. *Anderson v. Low Rent Housing Comm'n*, 304 N.W.2d 239, 252 (Iowa 1981).

■ Here, the district court allowed the jury to use transcripts prepared by persons associated with the State when portions of Means and Voelkers' videotaped statements to police officers were played for the jury. The district court allowed the transcripts to be used as an "aid to the jury to follow along." The transcripts were never admitted into evidence. The persons who typed the transcripts did not testify to their authenticity.

Authentication requires evidence sufficient to support a finding the matter in question is what its proponents claim. Iowa R.Evid. 901(a). Here, a review of the videotape and transcripts reveal minute differences between the two. While the transcripts were never actually admitted into evidence, we find the transcripts to be an accurate representation of the statements made on the videotape. Since the transcripts were accurate and were never admitted into evidence, we find no error in allowing the jury to use them while viewing the videotape.

### IV. Right to Confrontation and Cross-Examination

■ A confession of a codefendant is admissible into evidence against him or her because the confession is an admission by a party opponent. Iowa R.Evid. 801(d)(2)(A). However, a codefendant's hearsay statement inculpating another defendant is not admissible against the defendant under the traditional rules of evidence. *State v. Puffinbarger*, 540 N.W.2d 452, 457 (Iowa App.1995). The problem arises "only because the statement was admissible against the declarant [codefendant]." *Bruton v. United States*, 391 U.S. 123, 129 n. 3, 88 S.Ct. 1620, 1624 n. 3, 20 L.Ed.2d 476, 480 n. 3 (1968). Once the jury hears the statements, they may be inclined to use them against all the defendants, and not just against the declarant. *Puffinbarger*, 540 N.W.2d at 457.

■ The *Bruton* rule states a nontestifying codefendant's confession, which does not fit into any hearsay exception, incriminating the other defendant is barred by the confrontation clause from admission into evi-

dence at their joint trial. *Bruton*, 391 U.S. at 137, 88 S.Ct. at 1628, 20 L.Ed.2d at 485. *Bruton* applies only to situations where another hearsay exception allows the statements to be used against the nondeclarant defendant. *United States v. Kelley*, 526 F.2d 615, 620 (8th Cir.1975). However, statements which do not fall under a hearsay exception may nonetheless meet confrontation clause reliability standards if it is supported by a showing of "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 606 (1980).

■ The State contends Means' statements to Brown admitted into evidence differ in only minor respects to Voelkers' to the point they substantially interlock. As such, the State argues, Voelkers' statements contain sufficient indicia of reliability to be admissible despite the lack of cross-examination by Means. *See Lee v. Illinois*, 476 U.S. 530, 545–47, 106 S.Ct. 2056, 2064–65, 90 L.Ed.2d 514, 528–30 (1986).

■ While Means and Voelkers' statements interlock in a majority of the material facts, "a confession is not necessarily rendered reliable simply because some of the facts it contains interlocks with the facts in the defendant's statement." *Lee v. Illinois*, 476 U.S. at 545, 106 S.Ct. at 2065, 90 L.Ed.2d at 529. A codefendant's statement is presumptively unreliable as to the details concerning the defendant's conduct since a codefendant may possess a "desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." *Id.* Discrepancies between the statements which are significant render the codefendant's confession inadmissible. *Id.*

We, however, find the confessions by Voelkers and Means contained significant discrepancies. Voelkers' confession indicated Means would have shot Jensen if Voelkers did not, Means did not intend to take Jensen home when they left the party and knew of the plan to shoot her, Means knew Voelkers had the gun when they were leaving in the car with Jensen, and Means was capable of shooting Jensen. Such significant discrepancies render Voelkers' statement inadmissible against Means as it violates the *Bruton* rule.

■ The mere finding of a violation of the *Bruton* rule "does not automatically require a reversal of the ensuing criminal conviction." *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340, 344 (1972). Where a codefendant's confession is admitted erroneously, it may constitute harmless error if there is other overwhelming evidence of the defendant's guilt rendering the prejudicial effect insignificant. *State v. Waterbury*, 307 N.W.2d 45, 48 (Iowa 1981).

Here, we find overwhelming evidence apart from Voelkers' confession to implicate Means' guilt. The prejudicial effect stems from the discrepancies between the two confessions. Means' own statement indicated he grabbed a gun to kill Jensen earlier at the party after she bit him during a struggle to get her keys. Hager and Flegenhauer both testified Means was present when Flegenhauer struck Jensen in the head with an electric fan. Flegenhauer testified he heard Hoeck state he was going to kill Jensen, then instructed Means to get "Bud." He further stated Means retrieved "Bud," placing it next to the victim's head. Hager testified he heard Hoeck tell Means to "take care of business," which, from Means' own confession and testimony from other witnesses, meant to kill Jensen. Means' statement also revealed his encouragement at the scene of the shooting. He stated he told Voelkers to "go do it" or "take care of business" and revealed he moved to the driver's seat because they would need a quick getaway after Voelkers shot Jensen.

We find this evidence to overwhelming enough to render the prejudicial effect of the *Bruton* rule violation insignificant. As such, the error committed by the district court in admitting Voelkers' statement was harmless beyond a reasonable doubt.

## V. Conclusion

We find Means' statements to deputy Brown to be admissible. We find no error in the denial for a change of venue or with the jurors' use of the transcripts in connection with the videotaped testimony. We also find the violation of the *Bruton* rule constituted harmless error. As such, we affirm Means' convictions and sentences for second-degree

murder, first-degree robbery, first-degree kidnapping, criminal gang participation, conspiracy to commit robbery, and possession of an offensive weapon.

**AFFIRMED.**