# IN THE COURT OF APPEALS OF IOWA

No. 14-1376
Filed October 28, 2015

**STATE OF IOWA,**
 Plaintiff-Appellee,

**vs.**

**JASON JON MEANS,**
 Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Joel W. Barrows, Judge.


An offender, who as a juvenile committed first-degree kidnapping, second-degree murder, and several other felonies, appeals the district court order rejecting his motion to correct his prison sentence of life with the possibility of parole and ninety-five years with the possibility of parole. **AFFIRMED.**


Mark C. Smith, State Appellate Defender, and Nan Jennisch, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik and Mary A. Triick, Assistant Attorneys General, Michael J. Walton, County Attorney, and Kimberly Shepherd, Assistant County Attorney, for appellee.


Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

Jason Means was seventeen years old in 1993 when he committed second-degree murder, first-degree robbery, first-degree kidnapping, criminal gang participation, conspiracy to commit robbery, and possession of an offensive weapon. For those crimes Means, after a successful motion to correct illegal sentence, currently faces a term of life in prison *with* the possibility of parole and a concurrent term of ninety-five years *with* the possibility of parole.[1] For the second time, Means's challenge to the constitutionality of his sentence is before our court. Although he is not subject to any mandatory minimum terms before being eligible for parole, Means nevertheless contends he deserves an individualized sentencing hearing under article I, section 17 of the Iowa Constitution. He also argues the district court should have addressed his claim that the lengthy sentence was grossly disproportionate to his crimes under state constitutional principles.

Because recent precedents from the United States Supreme Court and the Iowa Supreme Court require individualized sentencing hearings only for juvenile offenders who face mandatory minimum terms, we affirm the district court's ruling declining to resentence Means. On his second claim, we find no need to remand for additional fact-finding. The record is adequate to decide

---

[1] On appeal, the parties disagree whether the original sentencing court imposed the term-of-years sentence to run consecutively or concurrently with Means's life sentence. In the district court, the State took the position that all of the sentences were to run consecutively. But at oral argument, the State asserted the Iowa Department of Corrections (DOC) is treating the life sentence as concurrent to the term-of-years sentence. We find Means should receive the ameliorative benefit of the State's concession and conclude the life sentence is concurrent to the term of ninety-five years.

Means is unable to meet the threshold showing that the gravity of his violent felonies compared to the severity of his sentence raises an inference of gross disproportionality.

## I. Background Facts, Proceedings, and Case Law Developments

Seventeen-year-old Michelle Jensen died from a single shotgun blast to the back of her head during the early morning hours of August 29, 1993. Her murder followed a party at the home of Anthony Hoeck. Before the party, Hoeck hatched a plan with Jason Means and Justin Voelkers to use Jensen's car to rob a convenience store. They intended to use the robbery proceeds to start a cocaine-selling business.

When Jensen refused to give up her car keys at the party, Means threatened her with a gun. Means and Voelkers then accompanied Jensen to her car, saying they were going to drive her home. Instead they drove to a rural area. When Jensen started to walk away, Means told Voelkers: "Go do it." Voelkers shot Jensen in the back of the head from four to six feet away, probably as she was kneeling, according to the medical examiner's testimony. Means served as the getaway driver, and they left quickly after Voelkers shot Jensen. When Means and Voelkers returned to Hoeck's home, they were laughing and excited. Means hid the shotgun shells under a mattress. Means joined others driving Jensen's car back to the body to steal her money. But after seeing the flashing lights of law enforcement at the crime scene, they retreated. They also decided not to rob the convenience store because it was "too busy."

Although he was a juvenile at the time of the kidnapping and murder, the State charged Means as an adult. During his 1994 trial, the jury watched a videotape of a police interview in which Means made several incriminating statements. The jury convicted Means of six counts: second-degree murder, first-degree robbery, first-degree kidnapping, criminal gang participation, conspiracy to commit robbery, and possession of an offensive weapon. The district court imposed a sentence of life without the possibility of parole for the class "A" felony offense of first-degree kidnapping. The court then ordered the remaining felony terms to run consecutive to each other for a total of ninety-five years.[2] At that time none of the sentences, other than the life term, carried mandatory minimum periods of confinement.[3] This court affirmed Means's convictions on appeal. *State v. Means*, 547 N.W.2d 615, 621-25 (Iowa Ct. App. 1996). Means did not seek further review or apply for postconviction relief.

During Means's incarceration, the law evolved in Iowa and federal courts regarding the sentencing of juvenile offenders under cruel-and-unusual-punishment standards[4] and regarding illegal sentences. In *Roper v. Simmons*, 543 U.S. 551, 578 (2005), the Court invalidated the death penalty for all juvenile

---

[2] These felonies carried indeterminate terms of fifty years (for second-degree murder); twenty-five years (for first-degree robbery), five years (for criminal gang participation); ten years (for conspiracy to commit robbery) and five years (for possession of an offensive weapon).

[3] In 1996, the legislature enacted Iowa Code section 902.12, setting mandatory minimum sentences for certain felonies.

[4] Article I, section 17 of the Iowa Constitution provides, "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

offenders under the age of eighteen. In 2009 the Iowa Supreme Court ruled a defendant's cruel-and-unusual-punishment challenge under the federal and state constitutions is a claim the sentence is illegal because it calls into question the court's power to impose a particular sentence. *State v. Bruegger*, 773 N.W.2d 862, 871, 884 (Iowa 2009) (recognizing, under the Iowa constitution, the concept embraced in *Roper*—that juveniles have less culpability than adults—has broad application outside the death penalty context). Under Iowa Rule of Criminal Procedure 2.24(5)(a), a "court may correct an illegal sentence at any time," and a "claim that a sentence is illegal goes to the underlying power of the court to impose a sentence, not simply to its legal validity." *Veal v. State*, 779 N.W.2d 63, 65 (Iowa 2010).

In 2010 the United States Supreme Court announced a "categorical rule" that a sentence of life imprisonment without the possibility of parole for nonhomicide offenses committed by juveniles violated the Eighth Amendment's prohibition against cruel and unusual punishment. *Graham v. Florida*, 560 U.S. 48, 74 (2010). *Graham* required the states to impose a sentence that provides some meaningful *opportunity* for the juvenile's release based on demonstrated maturity and rehabilitation and also determined the States, in the first instance, would create the means and mechanisms for compliance. *Id.* ("The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.").

*First Motion to Correct Illegal Sentence.* After *Graham* was decided, Means filed a motion to correct illegal sentence, challenging the constitutionality of his kidnapping sentence. The State resisted, pointing to Means's homicide offense of second-degree murder. Means was present at the hearing in July 2010. Defense counsel asked the court to order "a chance, as *Graham* states, for a reasonable opportunity for parole." The district court entered its September 2010 ruling without another hearing and without bringing Means back to court. The court found (1) *Graham* applied retroactively and (2) Means's crime of first-degree kidnapping was "a nonhomicide offense." Recognizing the *Graham* court "reasoned the punishment of life in prison without parole for nonhomicide offenses is too severe given the diminished culpability of juveniles," the district court granted Means's motion. The court concluded Iowa's statutory scheme for first-degree kidnapping constituted cruel and unusual punishment under both the federal and state constitutions. In fashioning a constitutionally permissible sentence, the court severed the statutory prohibition against parole for class "A" felonies from the life sentence. The court directed that Means would be "subject to parole consideration under Chapter 906 of the Iowa Code." Means was immediately eligible for parole on all sentences, and he did not appeal.

*Second Motion to Correct Illegal Sentence.* Less than thirty days later in October 2010, Means filed a second motion, "challenging his current sentence package as illegal." First, Means claimed he had a due process right to be present at the prior resentencing. Second, he argued the "life with parole sentence" still violated *Graham* because that sentence did not offer "a meaningful

opportunity for release." Third, Means alleged the "original consecutive sentences" imposed in 1994 were illegal due to the court's failure to "articulate any reasons for imposing consecutive sentences." Fourth and finally, Means claimed the court denied his right to allocution at the 1994 sentencing hearing. Means asked the court to vacate and correct the illegal sentences imposed, grant his right to allocution, and "give him the opportunity to show demonstrated maturity and rehabilitation" under *Graham.*

Before the hearing on Means's second motion, the Iowa Supreme Court resolved a juvenile's challenge to his sentence of mandatory life without the possibility of parole for a first-degree kidnapping conviction. *See Bonilla v. State*, 791 N.W.2d 697, 698 (Iowa 2010). A unanimous court ruled: "Under *Graham*, [the defendant's] federal constitutional right to be free from cruel and unusual punishment was violated when he was sentenced to life in prison without parole for the nonhomicide crime." *Id* at 701 (declining to address "the boundaries of the Iowa Constitution's prohibition on cruel and unusual punishment"). After concluding severance was available and appropriate, the court severed the "without parole" language and ruled "the provisions of section 906.5 establishing parole reviews will apply to Bonilla." *Id.* at 702. The court vacated Bonilla's sentence and remanded to the district court for resentencing to "life in prison, with the potential of parole." *Id.* at 703.

In March 2011 the district court held a hearing on Means's second motion to correct illegal sentence. Due to a miscommunication with the sheriff's office, Means was not present, and defense counsel did not object to his absence.

Defense counsel stated the DOC had told both counsel and Means that "he will not get a parole hearing ever." She contended, *because* the DOC is not providing "any meaningful opportunity of parole," the court's first order "is basically not in accordance with *Graham*." While counsel recognized the district court could sever the offending language, "without parole," in absentia, she asked for a resentencing hearing with Means present:

> Basically I would like a chance to resentence him, look at the entire sentence as a whole and also separately, and have the court resentence him in a way that is in compliance with *Graham*, and then also does allow him to have a meaningful chance of parole which is what *Graham* does.

The prosecutor argued the *Bonilla* case "in essence confirmed" the district court's September 2010 ruling. The prosecutor pointed out Means's second motion was filed within thirty days of the court's first ruling, so "the fact that in that thirty days" the DOC "had not yet put into place exactly how [Means's parole] was going to happen is understandable."

On March 4, 2011, the court ruled Means's challenges to the 1994 sentencing proceeding were issues of sentencing *procedure* "and those issues do not constitute an illegal sentence." The court also rejected Means's claim "he was sentenced in absentia" by the court's September 30, 2010 ruling, stating the court had ruled in Means's favor and the "correction of his sentence pursuant to *Graham* could not and would not have been altered by" Means's presence. Finally, the court rejected Means's claim his amended sentence remained unconstitutional because the DOC has failed to apply the modified sentence, noting "*Bonilla* further establishes" Means "is eligible for annual parole review" as

directed by this court. Thus, under *Bonilla*, the court's "amended sentence imposed September 30, 2010, is not illegal." The court instructed Means to seek administrative or postconviction relief if the parole board fails to follow *Bonilla*.

Means appealed and this court affirmed. *See State v. Means*, No. 11-0492, 2012 WL 3195975, at *3 (Iowa Ct. App. Aug. 8, 2012). Means sought further review.

While his request was pending, the United States Supreme Court held "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" who commit homicide offenses is unconstitutional under the Eighth Amendment. *See Miller v. Alabama*, 132 S. Ct. 2455, 2469 (2012). The Court found by "making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* The Court declined to find a "categorical bar on life without parole for juveniles" but cautioned, "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* The Court did not foreclose a district court's "ability to make that judgment in homicide cases" but required that court "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

After *Miller* was decided, the Iowa Supreme court issued a trilogy of decisions involving juvenile sentencing. *See State v. Ragland*, 836 N.W.2d 107 (Iowa 2013); *State v. Null*, 836 N.W.2d 41 (Iowa 2013); *State v. Pearson*, 836 N.W.2d 88 (Iowa 2013). In *Ragland*, the juvenile offender had been convicted of

first-degree murder, sentenced to life without parole, and the governor commuted the sentence to life with no possibility of parole for sixty years. 836 N.W.2d at 110-111. The supreme court first applied *Miller* retroactively to the commuted sentence. *Id.* at 117. Second, the court found *"Miller* applies to sentences that are the functional equivalent of life without parole." *Id.* at 121-22. Finally, the court ruled the sentence, as commuted, still amounted to cruel and unusual punishment under the federal and state constitutions. *Id.* at 122.

In *Null*, the court addressed whether a mandatory minimum prison term of more than fifty years triggered the protections to be afforded under *Miller*— "namely, an individualized sentencing hearing to determine the issue of parole eligibility." 836 N.W.2d at 71. The court concluded the sentence was unconstitutional "independently under article I, section 17 of the Iowa Constitution." *Id.* at 70. In 2015 the supreme court described its *Null* ruling as follows:

> In *Null*, we found when a judge sentences a juvenile to a mandatory minimum sentence, the judge must state his or her reasons on the record for imposing such a sentence. Likewise, if the sentencing judge believes the information in the record rebuts the presumption to sentence a juvenile to life in prison with the possibility of parole and the case is the rare and uncommon case requiring the judge to sentence the juvenile to life in prison without the possibility of parole, the judge must make specific findings of fact discussing why the record rebuts the presumption. In making such findings, the district court must go beyond a mere recitation of the nature of the crime, which the Supreme Court has cautioned cannot overwhelm the analysis in the context of juvenile sentencing.

*State v. Seats*, 865 N.W.2d 545, 557 (Iowa 2015) (internal citations and quotation marks omitted).

The final case in the trilogy, *Pearson*, involved a juvenile offender convicted of two counts of first-degree robbery and two counts of first-degree burglary. 836 N.W.2d at 89. The district court sentenced her to fifty years in prison with a seventy-percent mandatory minimum, making her ineligible for parole until she served thirty-five years. *Id.* The *Pearson* court found the Iowa Constitution "requires an individualized sentencing hearing where, as here, a juvenile offender receives a minimum of thirty-five years imprisonment without the possibility of parole . . . and is effectively deprived of any chance of an earlier release and the possibility of leading a more normal adult life." *Id*. at 96. The court remanded for resentencing with the district court applying "the *Miller* standards as described in *Null* and this opinion." *Id.* at 97.

*Iowa Supreme Court's Remand Order.* Eleven days after issuing the trilogy of cases, on August 27, 2013, the supreme court granted Means's application for further review and vacated our court's decision affirming the district court's ruling on Means's second motion to correct illegal sentence. The supreme court remanded the case for the district court "to reconsider the defendant's motions to correct illegal sentence" in light of *Miller*, *Null*, and *Pearson*.

A few months later, on February 14, 2014, the Iowa Supreme Court conditionally affirmed the corrected sentence of Means's codefendant Anthony Hoeck. Considering only the Eighth Amendment issue raised on appeal, the court held: "For a juvenile previously sentenced to life in prison without parole for a nonhomicide crime, the appropriate remedy under *Graham* was to sever the

parole ineligibility from the juvenile's sentence and sentence the juvenile to life in prison with the possibility of parole." *State v. Hoeck*, 843 N.W.2d 67, 71 (Iowa 2014) (endorsing procedure followed in *Bonilla*, 791 N.W.2d at 701). The supreme court remanded the case to the district court to allow Hoeck to amend his application to raise the state constitutional claim. *Id.* at 72.

Before the district court held the remand hearing ordered for Means, the Iowa Supreme Court also decided *State v. Lyle*, where the seventeen-year-old offender challenged his second-degree robbery sentence of ten years with a mandatory minimum of seven years, claiming "mandatory minimums cannot be constitutionally applied to juveniles." 854 N.W.2d 378, 381, 386 (Iowa 2014).

The *Lyle* court first discussed the upshot of *Miller*:

> *Miller* effectively created a new subset of categorically unconstitutional sentences: sentences in which the legislature has forbidden the sentencing court from considering important mitigating characteristics of an offender whose culpability is necessarily and categorically reduced as a matter of law, making the ultimate sentence categorically inappropriate. This new subset carries with it the advantage of simultaneously being more flexible and responsive to the demands of justice than outright prohibition of a particular penalty while also providing real and substantial protection for the offender's right to be sentenced accurately according to their culpability and prospects for rehabilitation.

*Id.* at 386.

Second, the *Lyle* court recognized the Iowa legislature signaled "its independent concern with mandatory minimum prison sentences for juveniles by

enacting" Iowa Code section 901.5(14),[5] and abolishing "mandatory prison sentencing for most crimes committed by juveniles." *Id.* at 388.

Third, the *Lyle* court determined the "sentencing of juveniles according to statutorily required mandatory minimums does not adequately serve the legitimate penological objectives in light of the child's categorically diminished culpability." *Id.* at 398 ("[T]he Supreme Court has recognized that the denial of even the opportunity to apply for parole for a portion of the entirety of the applicable period of incarceration renders the sentence harsher."). While recognizing the factors of rehabilitation and incapacitation *can* justify criminally punishing juveniles, the *Lyle* court found mandatory minimums do not further these objectives "in a way that adequately protects the rights of juveniles within the context of the constitutional protection from the imposition of [a] cruel and unusual punishment." *Id.* at 399.

As its bottom line, *Lyle* held a mandatory minimum sentencing scheme, like section 902.12, violated article I, section 17 of the Iowa Constitution when applied to juvenile offenders. *Id.* at 402. The *Lyle* court instructed sentencing courts:

---

[5] The legislature enacted 2013 Iowa Acts chapter 42, section 14 (codified at Iowa Code section 901.5(14) (2015)):

> Notwithstanding any provision in section 907.3 or any other provision of law prescribing a mandatory minimum sentence for the offense, if the defendant, other than a child being prosecuted as a youthful offender, is guilty of a public offense other than a class "A" felony, and was under the age of eighteen at the time the offense was committed, the court may suspend the sentence in whole or in part, including any mandatory minimum sentence, or with the consent of the defendant, defer judgment or sentence, and place the defendant on probation upon such conditions as the court may require.

It is important to be mindful that the holding in this case does not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed, nor does it prohibit the legislature from imposing a minimum time that youthful offenders must serve in prison before being eligible for parole. Article I, section 17 only prohibits the one-size-fits-all mandatory sentencing for juveniles.

*Id.* at 403.

A few weeks after *Lyle* was decided, on August 8, 2014, the district court convened the remand hearing, and Means attended. The court mused "the situation is somewhat confused by the fact the supreme court merely vacated the court of appeals opinion." The court and the parties agreed that Means's revised sentence of life with the possibility of parole "still stands." The State informed the court that Means "was reviewed for parole in September of 2013 and was denied." His next annual parole review was scheduled for September 2014.

Defense counsel asked the court to consider a "reconfiguration" of Means's entire sentence. Counsel argued Means's lengthy prison term was "in essence a life sentence." He claimed *Lyle* "opened some questions" about not only mandatory minimums but about forcible felonies and mandatory prison sentences. Counsel contended as "long as we have mandatory prison sentences, which we have here," the district court should conduct a resentencing hearing that takes into consideration the mitigating factors of youth. In response, the State argued that *Lyle* limited its finding of cruel and unusual punishment to mandatory minimum sentences imposed on juveniles during which there was no opportunity for parole.

Ultimately, the district court agreed with the State, concluding *Lyle's* holding did not provide relief to Means, whose sentence did not require him to serve any mandatory minimum term before he was eligible for parole. The district court observed that Means's "arguments want me to go to a place that the Iowa Supreme Court has not yet gone." The court held that *Lyle*, *Pearson*, and *Null* did not "mandate resentencing under these circumstances." The court denied Means's second motion to correct an illegal sentence, explaining as "the law currently exists, this sentence is not an illegal sentence because Mr. Means has the possibility of parole right now."

Means appealed, and our supreme court transferred the case to us.

## II. Standard of Review

We review claims concerning the constitutionality of sentences de novo. *See Bruegger*, 773 N.W.2d at 869.

## III. Analysis

### A.      Application of *Miller* to Original or to Corrected Sentence

Means claims the "rule contemplated by *Miller* applies retroactively to his original sentence" where he received a term of life in prison and an additional ninety-five years "without the benefit of an individualized sentencing procedure." Means argues severing the parole ineligibility did "not cure the illegality of the original sentence" because "even with the corrected sentence," he has been deprived of the constitutional mandate that youths be sentenced" by a court "considering the *Miller* factors." Means asserts the district court "erroneously believed its review on remand was limited to the corrected sentence." Finally,

Means urges us not to follow *Bonilla*, 791 N.W.2d at 702–03, which held that striking the invalid portion of the unconstitutional sentence met federal constitutional standards.

The State contends the focus has shifted away from Means's original sentence. The State points out that under *Graham*, his sentence of life without parole for first-degree kidnapping was "unconstitutional irrespective of the procedures by which it was imposed." To comply with *Graham*, the district court struck the unconstitutional provision in the same manner later approved in *Bonilla*—leaving Means immediately eligible for parole. Once that was done, Means was not entitled to an individualized sentencing hearing, according to the State, because a resentencing hearing where the court must consider the *Miller* factors is required only when parole eligibility is at issue. *See Null*, 836 N.W.2d at 70-71 (stating "protections to be afforded under *Miller*" are "an individualized sentencing hearing to determine the issue of parole eligibility"). The State concludes "all claims related to the original sentence are at this point moot."

In his reply brief, Means asserts the supreme court's remand order "created a unique procedural posture" whereby all issues raised in his two motions to correct illegal sentence were "resurrected and reconsidered by the district court."

It is true that the remand order directed the district court to reconsider the defendant's motions to correct illegal sentence. But Means, as the moving party, had the right to narrow the issue for the district court. At the remand hearing, defense counsel agreed with the district court and the prosecutor that the

question to be decided was the constitutionality of the corrected sentence, the sentence providing Means with immediate parole eligibility. Defense counsel did not pursue a challenge to the original sentence, instead stating: "[W]hat we're asking in this case, what we're asking for is that the court consider the sentence *as it is, as it stands*, we're asking that the court consider . . . a reconfiguration of life with the possibility of parole." (Emphasis added.) The court asked a follow-up question, seeking to clarify its understanding that Means was "asking for reconsideration with respect to all of the existing sentences." Defense counsel agreed, reiterating the existing sentences were life with the possibility of parole and ninety-five years. Having framed the issue in that manner in the district court, it would violate the principles of fairness undergirding our error preservation requirements to fault the district court for "failing to rule correctly on an issue it was never given the opportunity to consider." *See DeVoss v. State*, 648 N.W.2d 56, 60 (Iowa 2002).

Normally sentencing issues stand as an exception to the rules of error preservation, and illegal sentences receive an even wider berth. *See State v. Lathrop*, 781 N.W.2d 288, 292-93 (Iowa 2010). But this case involves an affirmative decision by Means, who asked the remand court to reconsider his already-corrected sentence. Parties cannot "predicate error upon the court's doing the very thing they requested the court to do." *See State v. Beckwith*, 53 N.W.2d 867, 869 (Iowa 1952) (declining to consider claim on appeal when defendant urged court not to grant mistrial after one juror was held in contempt); *see also State v. Eckrich*, 670 N.W.2d 647, 649 (Iowa Ct. App. 2003) (finding

defendant did not preserve double jeopardy claim where he made a tactical choice to withdraw his motion for adjudication of law points regarding multiple prosecutions to proceed with favorable sentencing).

But even setting aside Means's error-preservation problem, we do not believe the supreme court's remand order intended to or actually could reinstate a life-without-parole sentence deemed unconstitutional by *Graham*. Accordingly, the district court appropriately assessed the constitutionality of the corrected sentence. In making that assessment, the district court logically read *Miller*, *Lyle*, *Null*, and *Pearson* as applying only to "a situation involving mandatory minimums, and we don't have that here." The court decided it was "bound to apply the supreme court law as it exists," explaining to defense counsel: "The supreme court may go to the place where you want them to go, but that law does not yet exist. As the law currently exists, this sentence is not an illegal sentence because Mr. Means has the possibility of parole right now."

Like the district court, our court is bound by supreme court precedent. *See State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014). Our supreme court has found, under the federal constitution, a sentence of life without parole for a nonhomicide offense can be corrected by following the procedure in *Bonilla*. *Hoeck*, 843 N.W.2d at 71. But *Hoeck* did not resolve the issue of the corrected sentence's legality under the Iowa Constitution. *See id.* at 72. Three justices signed onto a partial dissent in *Hoeck*, contending the supreme court should have answered "no" to this question: "Does the Iowa Constitution categorically prohibit the general assembly from making a life sentence the designated

punishment to a heinous crime when that crime is committed by a seventeen-year-old even when there is no mandatory minimum the defendant must serve before becoming eligible for parole?" *Id.* at 73-74 (Mansfield, J., concurring in part and dissenting in part). The dissenters asserted: "We owe it to the citizens of this state to clarify the limits and scope" of *Null* and *Pearson*. *Id.* at 74.

It is appropriate for our court to defer to the supreme court on whether to extend the holdings of *Null*, *Pearson,* and *Lyle* to cases where juvenile offenders do not face any mandatory minimum sentences. *See State v. Marshall-Limoges*, No. 14-1610, 2015 WL 4936265, at *1 (Iowa Ct. App. Aug. 19, 2015) (rejecting request this court extend requirement to consider *Miller* factors to the imposition of any prison sentence on a juvenile defendant); *cf. Luana Sav. Bank v. Pro-Build Holdings, Inc.*, 856 N.W.2d 892, 893 (Iowa 2014) (noting our court appropriately deferred to supreme court on whether to extend the doctrine of an implied warranty of workmanlike construction). Accordingly, applying existing law, we affirm the district court's denial of Means's request for a resentencing hearing.

## B.      Mandatory Sentences of Imprisonment

In a slightly different argument, Means seeks to extend "the rationale underlying *Miller* and the *Null-Lyle* line of cases" to a sentencing scheme that "automatically imprisons juveniles" for forcible felony offenses. *See* Iowa Code §§ 232.8(1)(c), 702.11 (1993). Means reasons the heart of the constitutional infirmity in *Miller* was the mandatory imposition of the sentence, not necessarily its length. Means argues "*Miller* is properly read to support a new sentencing framework that reconsiders mandatory sentencing for all children" and suggests

"[s]ome juveniles will deserve imprisonment, but others may not." Means asks us to vacate his corrected sentence as illegal under the Iowa Constitution and remand for a resentencing hearing on all his convictions, a hearing that follows *Miller's* individualized sentencing process.

Current case law does not require a district court to consider the *Miller* factors before imposing any sentence of incarceration upon a juvenile offender. For the same reasons as articulated above, we do not see it as the role of our court to extend the *Null* and *Lyle* line of cases in that manner.

### C. Due Process Right to Be Present at Resentencing

Means also argues we should vacate his corrected sentence on due process grounds because "his presence was required when his sentence was corrected." Means first raised this issue in his second motion to correct illegal sentence, the district court denied relief, and this court affirmed. *Means*, 2012 WL 3195975, at *3 (holding claim was not properly raised in a collateral motion and should have been raised on direct appeal).

The supreme court vacated our ruling and remanded. But on remand, Means did not ask the district court to reevaluate this issue; thus, error has not been preserved. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (requiring issue to be raised and decided by the district court before it can be reviewed on appeal). Even if we assume the issue was preserved, it has no merit. A similar claim by Means's partner in crime was rejected by the supreme court. *See Hoeck*, 843 N.W.2d at 69 (letting stand, as its final decision, the court of appeals decision concluding Hoeck did not have to be present for the court to

correct his illegal sentence so long as the disposition would not be aided by his presence and the court's modification did not make the sentence more onerous).

### D. Gross Disproportionality

Means also raises a gross-proportionality challenge to his sentence under the Iowa Constitution. He claims even with the possibility of parole his sentence is "exceedingly lengthy and harsh"—potentially "off the charts." Means seeks a remand for a hearing on this issue.

The State contends we can reject this claim without a remand. The State argues ordering Means to serve an indeterminate prison term "until such time as the parole board determines his release is warranted and safe" does not constitute a grossly disproportionate sentence.

When the sentencing practice at issue does not violate any categorical bar, an offender may challenge his or her particular sentence as grossly disproportionate punishment. *State v. Oliver*, 812 N.W.2d 636, 640 (Iowa 2012). The *Oliver* court discussed the method for analyzing such a challenge:

> The first step in this analysis, sometimes referred to as the threshold test, requires a reviewing court to determine whether a defendant's sentence leads to an inference of gross disproportionality. This preliminary test involves a balancing of the gravity of the crime against the severity of the sentence. If, and only if, the threshold test is satisfied, a court then proceeds to [additional] steps.

*Id.* at 647 (citations and quotation marks omitted). Also, Iowa courts engage in a more stringent review of the facts of the case than would be available under the federal constitution. *Id.* at 650.

In addressing the threshold question, whether Means's sentence leads to an inference of gross disproportionality, our primary job is "to balance the gravity of the crime against the severity of the sentence." *Bruegger*, 773 N.W.2d at 873. In the balancing process, we consider several general principles. First, "we owe substantial deference to the penalties the legislature has established for various crimes." *Oliver*, 812 N.W.2d at 650. Second, "it is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." *Id.* Third, "a recidivist offender is more culpable and thus more deserving of a longer sentence than a first-time offender." *Id.* And finally, the unique circumstances of a case can "converge to generate a high risk of potential gross disproportionality." *Bruegger*, 773 N.W.2d at 884.

Critical to our analysis is the gravity of Means's crimes—second-degree murder, first-degree robbery, first-degree kidnapping, criminal gang participation, conspiracy to commit robbery, and possession of an offensive weapon. These offenses are among the most heinous acts identified in our criminal code. Means and his fellow gang members planned a robbery, and committed kidnapping and murder to launch a criminal drug enterprise. Their victim was a fellow teenager, who was driven to a remote location and shot execution-style after refusing to turn over her car keys. Means and his compatriots were giddy after the killing, and would have returned to steal the victim's cash if not for the fact law enforcement had already arrived at the scene. Means's conduct was not "inadvertently caught by a broadly written statute," a factor triggering the court's concern in *Bruegger*. *See Oliver*, 812 N.W.2d at 651 (citing *Bruegger*, 773

N.W.2d at 884). Rather, Means's purposeful, violent, and unremorseful actions fell squarely within the forcible felony statutes under which he was convicted.

On the other side of the fulcrum is the severity of Means's sentence. His maximum sentence is undeniably lengthy—life with the possibility of parole, as well as a term of ninety-five years, also with the possibility of parole. But it is not the most severe sentence possible, even for juvenile offenders. As we noted earlier, the State has conceded his life term and his term-of-years sentence are to be served concurrently. He is immediately eligible for parole, and the record shows the parole board has already reviewed his case.

The *Bruegger* court found a remand was necessary to gather evidence concerning the circumstances of the prior offense used for enhancement purposes, and to allow the State to present evidence of the impact of the current crime on the victim and her family, of the defendant's lack of remorse, of his inability to respond to rehabilitative services, and of the need to incapacitate the defendant. 773 N.W.2d at 886. In contrast, the record in this case is adequate to resolve the issue. No enhancing offenses were used in the determination of Means's sentence. And the original trial record contains evidence concerning the impact of the crime on the victim's family. In his victim impact statement, Michelle Jensen's father wrote:

> The loss of our daughter was devastating. The thought of having to live without her has affected us to the point that we can't even function as a family anymore. I walked around in a cloud for months. I didn't care about anything at all for some time. We will never be able to talk to her, or see her, or congratulate her at her high school graduation. We didn't even get to celebrate her 18th birthday with her.

In her victim impact statement, Jensen's mother wrote: "To live without Michelle is living hell . . . .  My life may as well [have] ended Aug. 29 with her."

This case does not present the "rare" circumstance where the defendant's sentence is so grossly disproportionate to the crime as to warrant additional scrutiny.  *See Oliver*, 812 N.W.2d at 650.  Because Means has not met the threshold test, no further analysis is necessary.

**AFFIRMED.**